Good morning, Your Honor. Good morning. Larry Gabriel Jenkins, Mullin & Gabriel, on behalf of the Chapter 11 trustee for the Estate of Fitness Holdings, Sam Leslie. May it please the Court. As noted in our reply brief, Your Honors, the determining issue on this appeal is whether the Bankruptcy Court can characterize or, if you will, recharacterize certain pre-bankruptcy financial transactions that occurred between the debtor and the debtor's owner. Do you want to reserve any time for rebuttal? I do, Your Honor. I would like to reserve five minutes. Thank you. And the individuals that owned and controlled the debtor from debt to equity, and if so, whether the trustee's facts presented in the First Amendment complaint meet the plausible standards of Iqbal and Twombly. Your Honor, as we noted again in our reply brief, there is a split of authority between the district courts on the issue of recharacterization. There is this case in which Judge Guilford relied on In-Rate Pacific Express, which rejected the ability of the Bankruptcy Courts to recharacterize a transaction from debt to equity. And it was on this basis that Judge Guilford rendered his opinion, as did Judge Ruffes in the Bankruptcy Court. Well, let me ask you this. What are the particular features of the promissory notes held by Hancock Park that you contend compel its recharacterization as equity holdings rather than debt? Well, I don't think that you can look at the document in and of itself, Your Honor, and say, oh, look at the document and say that it needs to be recharacterized. You need to look at the transaction as a whole. They can make up any document to evidence the transaction that they have and say, this is the contract, but it's not what the court should needs to do is to look past the form of that document and look at the transaction, the underlying features of the transactions to make sure that the --. I'm sorry. Finish that. I'm sorry. Go ahead. I'm just going to make sure that the transaction is what the document says rather than the document saying what the transaction is. I just wanted to back you up a little bit because I'm looking at the text of the Bankruptcy Code. Now, we know we're not bound by the BAP and Pacific's holding. But when I look at Section 105, which I think is the source that most of the courts have said is for changing the way they view a particular claim, that's very general. It's sort of a necessary and proper clause for the Bankruptcy Code. So then we get to that the bankruptcy court has the authority to determine a claim, what is a claim. But a claim is defined as a right to payment. So the question in my mind is if the bankruptcy court is free to consider whether there's a right to payment, don't they start with the document and see whether that's enforceable as a matter of state law? Well, they may start with the transaction. So would Hancock Park have the authority to go into state court as a matter of state law and enforce its payment, its promissory note? And as well as a trustee or a creditor could go into state court and challenge that state court under its equitable powers to address that issue under both California law, if you will. And so is it a matter of state law? Should the correct analysis have been whether there was a right to payment on that promissory note as a matter of state law? Well, as you noted, many of the circuits have gone back to 105 and used the broad equitable powers to address the issue. But interestingly, and something that I wanted to bring to the Court's attention, is a recent Fifth Circuit decision, which is, if you will forgive me one second, bear with me, In re, I'm sorry, Grossman v. Lothian Oil, Incorporated, in which the Fifth Circuit, which was a case that Pacific Express relied upon in rendering its decision, but Fifth Circuit has now changed its tune, if you will. And in this case, which was also a case of first impression, it's 650 F. 3rd, 539, 2011, upheld the right of the bankruptcy court to recharacterize it, albeit taking a different view other than the circuit's, relying on Bankruptcy Code 502B1 instead of the equitable powers described in 105. Holding that the claim should be allowed unless it is unenforceable against the debtor under any agreement or applicable law, the Court then took the term applicable law to mean state law. So we get back around. There's two. Correct. There's two paths which the courts could go down to recharacterize. One is under its equitable powers. The other path would be under 502, according to the Fifth Circuit. So when you, have you done the analysis under, as a matter of state law, and would that be California law? It would be California law, under fraudulent conveyance law. And I believe that if you look at the facts of our particular case, it meets all the criteria that are set forth in California law as to the transaction, the nature of the transaction and what occurred. Interestingly, when I was preparing for the argument today, I took the opportunity to go back and look at Pepper v. Litton, which is a Supreme Court case on issue which is often cited by bankruptcy lawyers as the equitable, for the equitable powers of the Court. And a detailed reading of that particular decision is really almost definitive and determinative of the issues that are presented here. For if we look at what they said in, what Justice Douglas said in that decision, of course they, I'm sorry. That might have been you. Oh. Did you want to say something? I did, but I was trying to wait for counsel to finish, so. Okay. You're going to have a question, so. Now that we've interrupted him anyway, let me just, let me ask a question. Let's assume you are right that bankruptcy courts do have the power to recharacterize so-called debt as equity. Judge Ikuda asked you whether it was a state law standard. You said maybe. Your briefs argue the Sixth Circuit standard or the Third Circuit standard, and they have, as close as I can tell, 11 or 14 factors in them. Assuming you're right in this case, isn't the appropriate thing for us to do, simply to tell the district court what the Ninth Circuit test is and send it back to that court to look at your complaint to see whether it's sufficient? That would be one resolution, Your Honor, but I think that would definitely. Well, isn't that the best, isn't that the best resolution? I mean, we have a district court which assumed that recharacterization was impossible. Correct. We have parties who need to know from us what the Ninth Circuit test is, if we can say it in any cogent fashion. If we determine that the Ninth Circuit test allows recharacterization, maybe there are facts you want to allege that you didn't. Maybe there are deficiencies in your complaint that we haven't perceived. Why should we take that up in the first instance? I know it's a matter of law, but we're all shooting here at an elusive target, and I'm a little bit reluctant to say the district court doesn't get the first crack at it. So tell me why I'm wrong. Well, Your Honor, I'd be thrilled if you sent it back to the district court to review under the appropriate standard. Of course, I think that's what should be done, and I think the Ninth Circuit ought to make that pronouncement, because I do believe under 105 or 502 there is the power of the courts to recharacterize. But I guess, okay, but even if we agreed with you on that, Judge Horwich is proposing why shouldn't we remand, but then he also used the words as a matter of law. So couldn't we also determine, even if we said the court has the power to recharacterize, that Hancock Park was a creditor, not an equity holder, and that there's no argument that the 2007 refinancing transaction was fraudulent? Well, I think if you took that approach, Your Honor, then you have to, of course, review the facts of the complaint de novo and make a determination as to whether under the appropriate standard that the court that the complaint set a plausible claim, which it did. I mean, excuse me. We set a factual pattern that was detailed as to the transactions. And I can show you the devil's stipulation. Well, but let me just. I'm going to play the devil's advocate here. Why should a panel not conclude that the committee, by signing the stipulation, that the bank had a valid, perfect, and first priority security interest, waived its right to assert a claim against the bank for fraudulent transfer? Well, first of all, the court would have to go back and read the stipulation, which we believe that the lower courts read in error. It was a very limited stipulation. It did not take into consideration the word solely, as we pointed out in our brief. It certainly never intended to waive the fraudulent transfer claims. You can have a valid lien, but that doesn't mean that it wasn't a fraudulent conveyance. And that's all the committee stipulated to as between as to allow some transactions to go forward vis-à-vis financing. There was never an intent to give up the claims. And to the extent there's an ambiguity in that language, then the court must, must under 12b-6, look at those facts in favor of the plaintiff and allow the plaintiff to at least get past the fleeting stage to present evidence as to what the intent of that particular language was. But apart from the merits, you agree that the we can make that determination because 12b-6, it's a matter of law whether you fail to state a claim or not. Is that correct? I believe that the court has the power to look at the complaint de novo and make a determination as to whether or not a plausible claim was presented. And I think what the problem with the district court and the lower and the bankruptcy court was, is that they went way beyond that. They went beyond the, first of all, they interpreted, clearly interpreted the facts in favor of the defendant. And second of all, they took into consideration facts that were not fled in the complaint, including this whole issue about the guarantee, which, as we pointed out in our brief, was an irrelevancy in and of itself. Yet both of the courts glommed on to that particular factor and said, oh, well, look, they gave additional consideration. But that, but you have to look at the transaction at the time of it, that it occurred, not six months later. If I may, I brought two charts that I would like, one to show the court, to show what the impact of this transaction was. Did you show them to the other side? I did. I gave them this morning. We had called your court and asked if we could present them. And they're all facts that are in the complaint. All right. Well, you can use them, even though oral argument generally is not, we're not talking to a jury, so. No, but I just thought that it would. I generally disfavor charts, but you can use them if the other side is not objecting. We have copies right here, so I don't need to, you don't need to cover their face. Do you see it, Judge Hurwitz? I can see that it exists, but I share your general view about charts during oral argument, so we'll see if it's confirmed. Okay. Well, I'll be telling you what's in the chart. So, if we look at the chart, just prior to the bank, just prior to the June 2007 transaction, and if we take an assumption that PW Bank was a secure creditor, there was $25 million in assets in fitness holding. There was secure debt of $8,800,000. There was unsecure debt of $9 million, and there was contributions by Hancock Park of approximately $24 million. Well, if things would have stopped right there, and there was a liquidation, because at this point in time, fitness holding was insolvent, and that's one of the tests. And so, if we would have stopped right there, we would have seen that as a result of the liquidation, so the secure debt would have been paid in full, the unsecured creditor debt would have been paid in full, and Hancock Park would have suffered a loss of $17 million, but they still would have gotten $7 million back. What happened was, Hancock Park goes to the bank and says, hey, we want to refinance all of the assets of this company, which then, prior to that time, were not in cover, so they took the $25 million in assets, and they got secure debt against them for every single penny. What happens? They then paid off Hancock Park of $12 million. I'm sorry, $11.8 million of the $24 million. So they've got $13 million loss, and what happens here upon liquidation is, because the bank is now fully secured, there are no assets to satisfy the unsecured creditor debt. $9 million, they get zero. And that's what happened in this case. Counsel, can I ask you? I'm sorry. Go ahead. Counsel, let me ask you, you've made a claim against the bank in this case, and I'm sort of mystified about that claim. Right. What did the bank do wrong here? Because in this particular case, we made an aiding and abetting the fraudulent conveyance claim against the bank. We understand that the bank acted, if you will, in the ordinary course. I have four minutes left. I'm going to answer the question. So it's not really your time. It's our time. Thank you, Your Honor. So the bank enters into a transaction, albeit a legal transaction. But under California law, under aiding and abetting, the bank knew that this was a fraudulent conveyance. Why? Because they had been dealing with this company for several years. They knew that the company was insolvent. They knew that the company was insolvent. Let me cut you off because you want to save your time. I understand the facts that you've alleged. Do you have any California case that suggests that a bank's lending transaction will be voided if perfectly regular on its face in an ordinary lending transaction simply because the proceeds are used for a fraudulent conveyance? Well, actually, Your Honor. I couldn't find one. Okay. You can take Casey. You can take First Alliance Mortgage, Lehman Brothers. I can take them, but they don't say that, do they? Well, I think Lehman Brothers comes very close. But Lehman Brothers did find aiding and abetting a fraud where Lehman Brothers made a loan to First Alliance Mortgage in the ordinary course of business, knowing that First Alliance Mortgage was going to commit a fraud. And both the court in the equitable proceedings and the jury. But that's a very different case. That's a case where they knew they were going to commit a fraud and fleece some people out of some money. And here what you're saying is what they knew was that the people that they loaned the money to might actually keep it. No. What they did was. . . That the company might actually use it to pay off some of the preexisting debt. What they knew. . . Is there any way that the bank knew this was equity? Why would the bank have known this was equity? The bank would know it was equity because they were dealing with the entity for several years. They knew who the players were. They knew what the structure of the company was. They knew that it was a, that the acquisition was a leveraged company. They knew what kind of contributions were made. And they had a long lending history with it. Now, what's interesting is, and your point is well made, Your Honor, is that on a motion to dismiss. . . Answer the question. You're now using your time, if you want. On a motion to dismiss, you have to take our case and say that it's okay. We have to develop facts. If later on, in summary judgment, it comes out that the bank didn't know anything, well, that's fine. But at least we get past the motion to dismiss. Thank you, Your Honor. I'll reserve the rest of my time. Thank you. Good morning, Your Honors. I think it's still morning, at least. Yeah, I hope so. Are you going to use all the time, or are you sharing time? We are sharing time, Your Honor. We've tentatively agreed that I'll speak for about 12 minutes or so. Mr. Hirshman will speak for a minute or two, and Mr. Eldon, who represents the bank, will take the balance of that time. Well, you can hardly get to the podium for a minute or two, but all right. So I'm going to stop you when there's eight minutes left, then give someone two. Is that what you're saying? That would be great, Your Honor. Thank you. All right. I would say, if you get done before that. So we've got eight, two, and six. No, eight, two, and six. Oh, you're going to take 12. You're taking 12, then two, and six. Yes. All right. Go ahead. Thank you, Your Honor. I'm Lance Jasper of Munger, Tolleson, Olson. I represent Hancock Park and Mr. Fortique in this matter. Your Honors, whether to recognize recharacterization as a remedy is a fascinating question in the circuit, and it's one I'm prepared to address, but it's not one the Court needs to decide in order to resolve this particular appeal. Well, yeah, we could if you're saying that you would win otherwise, but on the other hand, why shouldn't we adopt recharacterization so that the Court here said, I don't have the power to do it, and if we think that they did have the power to do it, why shouldn't we do it? Well, I think Your Honor took my point that on the facts alleged, we believe that they simply haven't stated a claim for it, even if such a claim exists, and hopefully I'll have a moment to talk about that. But to answer your question, Your Honor, I guess I would make two points. One is a procedural history matter. Both the Bankruptcy Court and the District Court looked to the facts of this in addition to Pacific Express, and they said what you've pled here is a loan. You haven't pled equity. So it's not something that that question is not new to this Court. Both of those courts addressed it before. But what if the 12-factor, 14-factor test that some of the other circuits have adopted were applied here? We think it cuts strongly against recharacterization. Happy to discuss that, Your Honor. The backdrop, of course, of that analysis would be these 11 transactions, whereby Hancock Park gave money to FHI in specific amounts, and FHI promised to repay that money with interest on a fixed date. Well, let me ask you this. Is it your position that replacing an unsecured debt with a secured debt can never amount to a fraudulent transfer, or are you saying it did not happen here, or do you assert both arguments? Both. Although we wouldn't say never, but what we're saying is all they have alleged here is borrowing on a secured basis to repay unsecured debt, and that's black-letter law. That's not a fraudulent transfer. But haven't they alleged more? Haven't they alleged more here? They've alleged that the sole shareholder of a company loaned, presumably loaned on paper, $24 million to an undercapitalized company which wasn't used, as they allege, for capital, but rather for operating expenses. And then it's not being paid back except through other borrowings. Put aside whether or not it eventually gets secured or not secured. This sure looks like equity to me. Is there any evidence that equity came from any place else into this company? Yes. Both in the bankruptcy schedules and in the complaint, there's reference to 4 million shares of equity that Hancock Park held in fitness holdings. So there is an equity. I understand that they held 4 million shares in equity, but what was the capitalization ratio when they began, when they loaned this $24 million? Capitalization to debt ratio. I'm not sure the ratio is alleged in the complaint. The way that we've talked about in the case is there's 4 million in equity, and then leading up to the refinancing, there's 24 million in unsecured debt. Now, Your Honor pointed out. Oh, I'm sorry. That's what I got out of the bank, lending documents. So essentially 6 to 1? Yes. Now, Your Honor pointed out this allegation that the money was used for business operation, and that allegation is made in the complaint, and it's raised in the opening brief. The Third Circuit instructs us that that is indicative of bona fide debt. And that's right. That's exactly what FHI, for instance, used PacWest's revolver for. It used it for business operations. And, Your Honor, if I may, that's not the only indication of bona fide debt here. If we dig into this multi-factor test that plaintiffs have put forward, plaintiffs have emphasized repeatedly, well, there was undercapitalization here. This was money going to an undercapitalized entity. Your Honor, I believe this goes to the question you just raised. In the bankruptcy context, the courts that recognize a claim for recharacterization have been clear. This cuts the other way. This cuts for debt. So Daewoo, Mall Industries, Submicron, and Hedged Investments, what those cases say is if you have somebody putting money into a distressed company and they're calling it a loan, the only rational conclusion is they're intending it to be a loan because they want to take advantage of being a creditor. The question of the sole shareholder. I'm sorry? Do those cases deal with the money being put in by the sole shareholder of the company? It's a good question, Your Honor. I know Daewoo involved a former parent. I'm not sure if it was a sole shareholder. I would have to – I actually suspect that one of those four cases did involve a sole shareholder. But I would have – and now that I think of it, I think Daewoo did. So I would direct the court to Daewoo on that point. But I'd like to go further because what we find, Your Honors, is you take the backdrop of these promissory notes, which point entirely towards debt, and they don't point at all towards equity. Okay. All right. We'll go ahead and proceed. Thank you, Your Honor. I want to walk through these factors that Judge Akud asked me about because we believe plaintiffs have tried to give the court the impression that there might be some reason to treat these notes as equity. And if you push on these factors and you look at the courts that analyze these factors, their argument gets weaker. It doesn't get stronger. And I mentioned that undercapitalization cuts against recharacterization. The same is true about insider lending. They've made the point, well, they were insiders, and they've even argued, who else would have loaned this money to this distressed FHI? And the courts are clear on this. You shouldn't use recharacterization to discourage that kind of lending. In Daewoo Motors, the court says, in many cases an insider will be the only party willing to make a loan to a struggling business. And recharacterization should not be used to discourage good-faith loans. All right, so we could say that the court could recharacterize and we could set out the Ninth Circuit test, but then you're saying that your argument then would be that this debt should not be recharacterized. I think respectfully we win easily under this test. And I've just talked about two of the factors that cut against recharacterization. We mentioned the business operations allegation, which cuts in favor of bona fide debt. And I have more on my list in terms of factors that help our case. Now, have you looked at this under state law? So let's assume that the bankruptcy court's job is to determine whether it's a claim or not, whether it's a right to repayment, and that's a question of state law. How would this be analyzed under state law? Your Honor, given that the bank addressed that issue in the brief, I did do some research on it. I didn't find a multi-factor test in California law akin to what you see in these other cases. But what I did see is that California law places considerable emphasis on the four corners of the document when it's talking about asserting intent. The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity. That's CalCiv 1638. So what's your read on the stipulation? The stipulation doesn't affect our case. And so my personal read on it is that it's clear on its face that these are valid to the bank, but it doesn't affect our client's case. So it's not something that I've spent a lot of time thinking about. I would note, though, Judge Yakuta, that I think we agree that you should look under the bankruptcy code to the definition of claim, but I would just approach it a little bit differently. This is a fraudulent conveyance action. And so the question really becomes not is there an independent claim for recharacterization of debt. We think there shouldn't be, and Pacific Express got that right, which I can explain. The question is, is this a debt for purposes of Section 548 of the bankruptcy code? And in United Energy, this court said, well, let's look at that. Congress put a, quote, expansive, unquote, definition of debt into the bankruptcy code. That's how it wanted debt to be treated for these purposes. It wanted it to be construed, again, in the Ninth Circuit's words, broadly. And it went then to apply that definition to the fraudulent conveyance in question. And so we certainly, since we would prevail under the multi-factor test, we would prevail under the broader definition of debt or claim within the bankruptcy code. So you said, though, that it would be conceivable that someone could establish a fraudulent transfer when replacing an unsecured debt with a secured debt, but this was not the case. What would you think would show? You would need an allegation of actual fraud. You'd need, for instance, a misrepresentation of the debt to a creditor in order to induce some lending. That's the kind of thing that, if this were an actionable lawsuit, you would hear about that. You would hear, well, FHI went to other creditors, and they said, don't worry about this debt. It's not real debt. But that's not what happened here, and that was not alleged, which is one of the reasons they don't have a fraudulent transfer claim. I think, since I have a little bit of time, and Judge Callahan, you asked me about Pacific Express, if you look at Pacific Express on the actual posture of that case, the actual holding of that case, I think this court can and should approve it without creating a sharp break with the other circuits. So in Pacific Express, the defendants had filed a proof of claim in the bankruptcy court, and the plaintiffs could have objected to that under Section 502, but they didn't. And, of course, what happens in bankruptcy is a proof of claim is presumptively valid unless you have an objection. Instead, the plaintiffs said, we're going to bring a separate cause of action for recharacterization, and that's what the plaintiffs have done here. They have this claim number seven that says recharacterization. The bankruptcy court said, it's not in the code, but nevertheless, I'm going to use 105, and I'm going to import this tax test. The BAP says on appeal, paraphrasing, hold on a second. You could have objected under 502, and you didn't, so now we have a claim. Once you have a claim, the only thing that the bankruptcy code allows you to do is equitably subordinate it. Under 510, there is no 510.5 that allows you to do recharacterization, so we dismiss. I think that's exactly right. Where Congress wants a lending transaction to undergo special scrutiny with a multi-factor test, it writes it into the code because that's exactly what it did with the tax code. It said, consider these. I'm sorry, Your Honor. All right. Let's put your sound on. I did, and I know you wanted to be able to give time to your, which is why I was waving now. Well, no, go ahead. Ask your question, and then whenever that's done, then we'll go for the, I'll reserve the remaining eight, so go for it. Let me just ask you, and I'm just asking as a factual matter here in the complaint, because I'm going down the list of things in the Sixth Circuit test. Do you agree that there were, these loans until the last were unsecured? Yes. From Hancock Park to? Yes. Okay. And that really in the absence of the guarantees by Hancock Park, the debtor could not obtain outside financing? I'm not sure that, that may overstate a little bit from our perspective. Well, that's alleged. You agree to that? They've alleged that. It's paragraph 72. Yes. As I mentioned before, they've said that only an insider would lend to a distressed company under these circumstances, which we've pointed out courts say isn't a basis to recharacterize. Now, I understand. I'm just trying to see which of these factors are present. The original transactions were called subordinated promissory notes. Correct. What were they subordinated to? The senior debt, the debt to PacWest. And was there any sinking fund? No. To pay these notes? No, I mean, not alleged. If there was, they haven't laid it out for us in the complaint. Right. They said there wasn't one. Yes. They did allege that the notes were never repaid except by more borrowings from the bank. Is that right? Were any payments made on the notes? That requires some clarification, if I may, Your Honor. But that would only take 15 or 20 seconds. You can answer his question, so go ahead. And then I'll stop asking questions. Okay. Just, no, ask what you have. They have asserted that payments were not, what they've said is most or all payments under certain of the notes were not paid leading up to the refi, which is a bit of an ambiguous statement. And then what they've used that assertion to do is to suggest that the parties disregarded the promissory notes because they behaved inconsistently with those notes. So that's what they've said. Thank you. Okay. And I will address that because I think that's really their big argument is, wait a minute, we know you had these notes, but then FHI wasn't making payments and Hancock Park didn't default. So this casts some doubt. All right. Well, that, you've answered his questions and you're over time now. So I'm going to put the clock back to eight so that. Okay. Then I respectfully just direct Your Honor to Daewoo Mall Industries and Section 3 of the promissory notes on that point, Section 3C and 3E. Thank you. Thank you. All right. You have two minutes. Good morning, Your Honors. I'm Ralph Hirschman. I represent only one appellee, Kenton Van Harten, and there is a complete identity in the position of one of Mr. Jasper's clients. That would be Mr. Fortique and Mr. Van Harten. Each was a director. In addition, Mr. Harten was an officer of the debtor. However, Delaware law instructs us, the case of Gantler v. Stevens summarizes the state of Delaware law, that the fiduciary duty of an officer and the fiduciary duty of a director are identical, and accordingly, our positions merge. All right. Thank you. All right. We'll stop the clock for a sec. Good morning. Now you have the balance, 7 minutes and 15 seconds. It seems like an eternity by comparison. Good morning, Your Honor. David Eldon of Parker Millican for Appellee Pacific Western Bank. There are, from the bank's perspective, I think, given the time available, two issues here. Let me address the aiding and abetting charge, first of all. I think as spelled out at great length in my briefing, the impari delicto doctrine applies here. And so even if one assumes favorably to the plaintiffs that there was a breach of fiduciary duty by Mr. Van Harten and Mr. Fortique, the bank can't be liable on an aiding and abetting theory because their knowledge as officers and directors of the company is imputed to the debtor. Now it's true that the plaintiff says, but wait, they abandoned the debtor's interests. They were acting adversely to it. Fair enough. But under the impari delicto cases, again, I'll cite it at far too much length in the briefing, and under basic principles of agency law, there is what's called the sole actor exception, which applies here because Mr. Van Harten was the only officer of the company, and Mr. Fortique and Mr. Van Harten were the two directors. The complaint alleges that they controlled the board, and in their opening brief on appeal, the appellants simply come right out and say, I believe page three or four, that they were the only two directors. And so under this sole actor exception, these two guys were the debtor. There was no one else. It was not a case of a small number of officers or directors running rogue and acting adverse. And so under the sole exception, or pardon me, the sole actor doctrine, I believe that ends the inquiry with respect to the aiding and abetting charge. With respect to the fraudulent transfer causes of action, Judge Hurwitz asked, what is it about this bank loan and the bank taking back a lien that is fraudulent? And the answer is nothing. In the trial court, in the bankruptcy court, in their original complaint, the appellants essentially asked for a double recovery. They wanted to claw back the cash from Hancock Park, but at the same time, they wanted the bank's security interest on that cash avoided. So they wanted to get the cash back, but also have it free and clear, unencumbered. At the first round of 12B6 motions in the trial court, Judge Russell disposed of the appellant's fraudulent transfer claims against the bank on the basis of the stipulation. So there was really no need to get into this double recovery aspect of the pleading. And it has lain dormant until now. In their appellant's reply brief in this court, at pages, I believe, 11 and 12, the appellants, for the very first time, clarify, in essence, really admit that the problem here was the payment by Fitness Holdings, the debtor, to Hancock Park. They're not disputing that the bank loaned $25 million in cash and took back a lien for $25 million. That's not a fraudulent transfer. The bank gave value, and it got a security interest in return. The real problem being alleged by the appellants, as I stated in the trial court and have continued to state all the way up, is what Hancock Park, pardon me, what the debtor, Fitness Holdings, chose to do next with the money that it controlled. As the appellants say in their reply brief at page 12, the money from the refinancing, that $12 million in extra cash, was the debtor's property. If it then chose to pay Hancock Park, that's between it and Hancock Park. If it was legitimate unsecured debt owed to Hancock Park, then by definition it's not a fraudulent transfer. Contrary to what the appellants have said, a payment substituting paying off unsecured debt with cash incurred by secured borrowing is not a fraudulent transfer. And I would simply refer the court to page 30 of my brief in this court, the footnote that describes Dean v. Davis and the way it's been limited over the years. But more importantly, with respect to the stipulation, in the trial court, here today Mr. Gabriel said, well gee, if there's ambiguity in the stipulation, that should have been resolved by means of extrinsic evidence. That is the first time the appellants have ever made that argument. In the bankruptcy court, they offered up the stipulation, and then they relied on a case called Broadway City for the proposition that there is a magic words approach. That if you don't use the word non-avoidable, then by definition they can still bring avoidance actions. Even though they've stipulated that the security interest is valid, enforceable, perfected, etc. And even though if you avoid it, then it's no longer valid, enforceable, etc. They didn't use the word enforceable, right, in the stipulation? That wasn't until the following paragraph. Yeah. So they said that the lien was valid. And perfected and first priority. And does that get you? It doesn't change the analysis. Judge Russell and Judge Guilford both said, well gee, if it's avoidable then it's not enforceable. But the exact same analysis applies with respect to the words in paragraph 26. If it's avoidable. If it's valid, then it necessarily is not avoidable? Is that what you're saying? If it is valid, the Broadway City case says, takes exactly the approach Your Honor is suggesting. Well, just because somebody is stipulating that it's valid now, doesn't mean it can't be avoided in the future. Well, that approach in Broadway City has never been followed. The case has never even been cited except by a district court refusing to follow it. It's dicta in that case. And as I pointed out in my briefing, the cases, Broadway City and the other cases relied on by the appellants, involved parties who were not parties to the underlying stipulation, later coming into court and trying to either shield behind the stipulation as defendants or to use the stipulation offensively. And so that's why they're, in my view, distinguishable. But let me say something about the extrinsic evidence argument. Well, let me ask if there aren't other questions from the court. If the court wants to, are there any other questions from the court? Otherwise, you've used your time. There's no other questions. Thank you, Your Honor. I think I had a minute and a half left. One thirty-nine. Okay. So very quickly, Mr. Elden stated that with respect to fraudulent conveyance, that if it's avoidable, it's not enforceable. That simply isn't true. It just merely means that the transaction is fraudulent. And it can be avoided under the callback powers of the bankruptcy court. It doesn't mean that it's avoid ab initio from the beginning. So there's the distinction with respect to that particular point. He also said that this wasn't a fraudulent conveyance because the bank gave value. That's not the test for a fraudulent conveyance. The test is what did the debtor get? Did they get reasonably equivalent value for the transaction? And in this case, we allege, under the facts of this case, that it did not. With respect to the imperi delicto argument, that is a very complicated argument, obviously. There are a number of factors that address that situation. Again, I would urge you to look at Pepper v. Litton, which says basically that a court, in the event of a bankruptcy of a corporation, enforceable by the trustee, for that standard, a fiduciary obligation is designed for the protection of the entire community of interest in the corporation, creditors as well as stockholders. It's not a limited situation where the trustee just steps into the shoes of the debtor and is limited to that. The trustee steps into the shoes of the creditors as a whole, and therefore we would submit that imperi delicto doesn't apply. All right. Your time has expired. Thank you, Your Honor.  All right. This matter will be submitted. Thank you very much. Thank you.
judges: Callahan, Ikuta, Hurwitz